Filed 9/11/15

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re ALBERT W., a Person Coming Under the Juvenile Court Law. | C073744 |
| THE PEOPLE, | (Super. Ct. No. JV124256) |
| Plaintiff and Respondent, | |
| v. | |
| ALBERT W., | |
| Defendant and Appellant. | |

APPEAL from the dispositional order of the Superior Court of Sacramento County, Stacy Boulware-Eurie, Judge. Affirmed.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, II-B, and II-C of the discussion.

1

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Michael Dolida, Deputy Attorney General, for Plaintiff and Respondent.


Delinquent minor Albert W. timely appeals from an order committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF).[1] He contends:  1) insufficient evidence supports the finding that he was competent; 2) the most recent sustained petition filed against him was a Louisiana petition that precludes a DJF commitment; 3) he was misadvised about the possible consequences of his admission; and 4) the juvenile court abused its discretion by committing him to the DJF.

As we shall explain in the published portion of this opinion, Part II-A of the Discussion, the term "any petition" as used in Welfare and Institutions Code section 733,[2] which limits commitments to DJF based on the nature of the "most recent offense alleged in any petition," does not encompass sister-state delinquency petitions as the minor claims.  In the remainder of the opinion, we reject the minor's other claims of reversible error.  We shall affirm.

## BACKGROUND

The minor was made a ward at age 12 based on his May 1, 2008, admission to second degree robbery, after which a petition alleging residential burglary and knowing

---

[1]  "Effective July 1, 2005, the correctional agency formerly known as the California Youth Authority (CYA) became known as [DJF].  DJF is part of the Division of Juvenile Justice [DJJ], which in turn is part of the Department of Corrections and Rehabilitation.  [Citations.]  Statutes that formerly referred to CYA . . . now refer to DJF."  (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1145, fn. 1; see *In re J.L.* (2008) 168 Cal.App.4th 43, 47, fn. 1 [DJJ and DJF interchangeable].)

[2]  Further undesignated statutory references are to the Welfare and Institutions Code.

receipt of stolen property was dismissed with the understanding those charges could be used at disposition. The minor was sent to live with his father in Louisiana under the supervision of the probation department.

Two sustained Louisiana petitions followed, alleging simple burglary, simple criminal damage, and disturbing the peace. On May 23, 2010, Louisiana authorities closed the minor's case and returned him to his mother in California.

A notice filed under section 777 on August 18, 2010, alleged several violations of probation (VOPs). (See *In re Greg F.* (2012) 55 Cal.4th 393, 400, 403-405 [describing VOP procedure].) A second VOP was filed the following week, alleging the minor had committed two residential burglaries.

On January 5, 2011, proceedings were suspended, and after three evaluations-- including one by Dr. Kevin Dugan--the parties submitted the matter on September 16, 2011, and the minor was found incompetent and referred to determine if he was intellectually disabled and to design an appropriate placement plan.

On January 27, 2012, the probation department sought a warrant because the minor had absconded after threatening his mother with a sawed-off shotgun the day before. On February 7, 2012, the minor was detained. He was later released to his mother.

On May 11, 2012, another VOP was filed, alleging the minor threatened a school official, among other acts. Later that month, a notice was filed alleging a violation of electronic monitoring restrictions. Another notice and a VOP replicating the charge of threatening a school official were filed on June 1, 2012. A superseding VOP was filed on June 8, 2012, adding that the minor possessed a loaded firearm at school, and related allegations. Later, a superseding June 26, 2012 VOP was filed.

On July 11, 2012, counsel again expressed a doubt about the minor's competence. This time, Dr. Dugan's report *rejected* his 2011 diagnosis of "mild mental retardation" and incompetency and concluded the minor had been malingering. After a contested

3

hearing held September 25 to 28, 2012, the juvenile court (Twiss, J.) found the minor to be competent.

Meanwhile, in July 2012, the probation department filed a report stating the minor was classified as a gang member and had had six formal incident reports while in custody; further he was sophisticated and dangerous and had failed on home supervision and electronic monitoring in the past.

A second superseding VOP was filed on October 16, 2012, but the minor was not present due to a behavioral issue triggered when his counsel suggested continuing the case for two weeks, and the arraignment was postponed.

On November 15, 2012, the minor admitted he committed a residential burglary in 2010, and the juvenile court dismissed the remaining VOP charges with the stipulation that they could be used for dispositional purposes. These included another 2010 residential burglary, criminal threats with personal use of a firearm in January 2012 (Pen. Code, §§ 422, 12022.5, subd. (a)), attempting to deter a peace officer by threats in May 2012 (*id*., § 71), attempting to resist another officer by threats later in May (*id*., § 69), and possessing a loaded handgun at school in June 2012 (*id*., § 25850, subd. (a)).

On November 29, 2012, yet another VOP was filed, alleging the minor had assaulted another resident of his detention facility.

At a hearing on December 6, 2012, the juvenile court (Oros, J.) ordered a 90-day diagnostic evaluation (see § 704), after two unreported conferences with counsel, and after the minor's counsel argued for a Level B referral.[3] The November 29 VOP was dismissed with the understanding that it could be used at disposition. The court found the minor eligible for DJF placement. The minor opposed a DJF commitment, due partly to

---

[3] The evaluation was not carried out, based on the lack of a contract. (See § 704, subd. (c).)

4

the Louisiana cases, arguing that his most recent offense (committed in Louisiana) was "an admission to a non-707(B) offense."

At the dispositional hearing on March 28, 2013, the juvenile court (Boulware-Eurie, J.) committed the minor to DJF for up to five years. The minor timely appealed.

## DISCUSSION

### I

*Competency*

The minor raises various challenges to the competency finding.

A. *Facts*

At the competency hearing, Dr. Dugan testified (in a manner consistent with his 2012 report) that the minor was malingering. He noted that the minor would change from cooperative and communicative to hostile, so that standard testing could not be completed. He had spoken with Aida Fuchs, at the Alta Regional Center, who had reported on the minor's progress, and learned the minor was not making a good faith effort to avail himself of the services he had been receiving. His testing results reflected a poor effort; he had initially improved and then, after demonstrating progress, he tested below the level expected if the test taker were "randomly guessing." This "notably deteriorating score after demonstrating consistent pattern of increasing a competence in learning" was unexpected.

After a break in the hearing, the minor refused to return to court and was using profanity. The minor claimed the prosecutor, the judge, and Dr. Dugan were conspiring against him. The next court day, the minor returned to court.

Dr. Dugan again testified the minor was malingering. He based this opinion on disparities in an IQ test he had administered in 2011 indicating "mild mental retardation," and his later evaluation in which the minor did well when he wanted to. At the 2011 evaluation he had found the minor to be incompetent, partly also based on a finding of paranoia. The minor now had the ability to understand the charges and the nature of the

5

proceedings, and the ability to cooperate with counsel, if he wanted to. He was not incompetent. Dr. Dugan applied a presumption of competency in forming his opinion.

Christopher White, a special education teacher who performed competency training (including at the Alta Regional Center working with intellectually disabled children), had helped develop the program in 1991. He had worked with the minor beginning January 6, 2012. Through testing, he determined the minor could learn. When the minor was in custody, he continuously regressed and blamed the regression on his incarceration. He used specific terms like "regress" and "comprehend," terms which White had not used with him, and then immediately claimed not to know what the terms meant despite the fact that he had used them accurately. The minor told White he had spoken to another of White's clients (in custody) about competency, and the "other client had been making real good progress and then just stopped also." The minor then "regressed" so that his testing fell below random answering.

The juvenile court (Twiss, J.) and the parties assumed the burden of proof rested with the minor to show incompetency by a preponderance of the evidence. The court found the minor had a "condition" within the meaning of section 709,[4] specifically, "a relatively low functioning level" coupled with developmental delay and developmental immaturity. But the court credited Dr. Dugan's testimony that the minor was competent. It found Dr. Dugan had in essence repudiated his 2011 opinion, and in any event with the passage of time the minor was now competent, because the preponderance of the evidence did not show the minor either lacked the ability to consult with counsel or lacked the ability to understand the nature of the charges or the proceeding.

---

[4] Section 709, subdivision (b), requires that when a doubt is expressed an expert evaluate "whether the minor suffers from a mental disorder, developmental disability, developmental immaturity, or other condition and, if so, whether the condition or conditions impair the minor's competency."

B. *Discussion*

### 1. Burden of Proof as to Competency

The minor initially contended there was no presumption of competency in delinquency cases, and a minor does not bear any burden to prove incompetency. As the minor concedes in a supplemental brief, our Supreme Court has decided these issues adversely to the minor. (*In re R.V.* (2015) 61 Cal.4th 181.) We are bound to follow that precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### 2. Presumption of Continued Incompetency

The minor contends that because in this case he previously was found to be incompetent, a presumption of *continued* incompetency should have been applied, requiring the People to prove he had been *restored* to competency. We disagree, and add that the court's failure to apply any such presumption did not result in prejudice in this particular case.

The minor's claim is based on an analogy to the criminal competency statutory scheme, which provides that a defendant found incompetent may receive a certificate of restoration of competency, and this certificate re-establishes the presumption of competency if competency is later challenged. (See *People v. Rells* (2000) 22 Cal.4th 860, 865-868 (*Rells*).) The minor notes the *absence* of any provision for certification of restoration of competency in the juvenile competency statutes, and argues this means once he was found incompetent, he should have been presumed incompetent at the later competency hearing, and therefore a new hearing is required in this case.

The argument fails to persuade for three reasons.

First, as we explain, the absence of a certificate of restoration of competence has no effect on the burden of proof in criminal cases, according to the very authority relied on by the minor. Instead, even where no such certificate has been filed, the mere passage of time compels a return to court for a hearing where the criminal defendant still bears the burden of proof if he claims to *remain* incompetent. (*Rells*, *supra*, 22 Cal.4th at p. 867.)

7

Penal Code section 1370, subdivision (b)(4) [formerly subd. (b)(2)] provides that after 18 months of treatment after a finding of incompetency, a defendant shall be returned to court for a hearing pursuant to "Section 1369." Penal Code section 1369, subdivision (f), setting forth the procedures for a criminal competency hearing, provides for a presumption of competency. Penal Code section 1372, subdivision (a)(2) requires that the order committing the defendant for treatment shall provide that the defendant be returned to court when a certificate of restoration of competence has been issued.

In construing these statutes, our Supreme Court has held as follows: "[F]or a hearing on a defendant's recovery of mental competence, Penal Code section 1372, unlike Penal Code section 1369, does not establish, expressly, a presumption that the defendant is mentally competent unless he is proved by a preponderance of the evidence to be otherwise. We believe, however, that it does so impliedly. The presumption that the defendant is mentally competent unless he is proved by a preponderance of the evidence to be otherwise is applicable at a trial of the defendant's mental competence, *in spite of the fact that it may run counter to any doubt expressed by the court and supported by the opinion of his own counsel*. This presumption is applicable as well at a retrial of the defendant's mental competence, which is mandatory when the defendant has been committed for 18 months and remains so without a certificate of restoration to mental competence filed by a specified mental health official, *in spite of the fact that it is inconsistent with his apparent* non*recovery of mental competence*. Therefore, in our view, this presumption should be understood to be applicable at a hearing on the defendant's recovery of mental competence, *where it conforms in fact with the certificate of restoration filed by the specified mental health official*." (*Rells*, *supra*, 22 Cal.4th at p. 867.)

Thus, *whether or not a certificate of restoration has been issued*, a criminal defendant eventually will be returned to court for a new competency hearing at which he or she will again bear the burden of proof. This undermines the minor's analogy, as does

8

authority subsequent to *Rells*. After discussing *Rells*, our Supreme Court in *In re R.V.* stated "Because the presumption of competency applies in a wardship proceeding, the party asserting incompetency bears the burden of proving the minor is incompetent to proceed." (*In re R.V.*, *supra*, 61 Cal.4th at p 197.) We infer no exception for minors previously found incompetent in this passage.

Second, after competency training for the minor was underway, it was minor's counsel who again declared a doubt about competency, and therefore the minor properly bore the burden of proof, again. In accordance with general motion practice, the party seeking the finding of incompetency bears the burden of proof. (See *Rells*, *supra*, 22 Cal.4th at p. 867; *People v. Lopez* (1997) 52 Cal.App.4th 233, 251 [" '[o]n all motions the burden is on the moving party' "].)

Third, the trial court found Dr. Dugan disavowed his earlier (2011) opinion of incompetency, because he now (2012 and onward) believed the minor was a malingerer. Thus, any presumption claimed by the minor was undermined because the original finding was shown to be based on the faulty assumption that the minor was providing reliable information when tested for competency. No prejudice appears. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1391 [error in criminal competency hearing harmless where the hearing that was conducted "protected [the defendant's] right not to be tried or convicted while incompetent"].)

### 3. Sufficiency of the Evidence of Competency

In challenging the sufficiency of the evidence of competency, the minor initially argued for an "independent review" standard of review. In a supplemental brief, he concedes we must review a juvenile court's finding of competency under the substantial evidence test. (See *In re R.V.*, *supra*, 61 Cal.4th at pp. 200-202.) We view "the record in the light most favorable to the juvenile court's determination." (*Id.* at p. 200.) Where, as here, the juvenile court has found the minor to be competent, we must ask "whether the

9

weight and character of the evidence of incompetency was such that the juvenile court could not reasonably reject it." (*Id.* at p. 201.)

The minor asserts the evidence showed he was incompetent, but in making this argument he details the evidence in the light most favorable to him. The juvenile court certainly could rationally credit Dr. Dugan's current opinion--corroborated by White's testimony--that the minor was a malingerer, and that Dugan's 2011 opinion had been based on the incorrect assumption that the minor had been sincerely cooperating in the psychological and other evaluations.

The minor concedes, as he must, that Dr. Dugan's 2012 report found the minor was competent and was simply unwilling to participate in services and unwilling to cooperate with his attorney. But he argues Dr. Dugan's *testimony* was "less decisive and clouded with uncertainty." We disagree. Although Dr. Dugan testified he could not be *certain* that the minor was malingering, he "strongly suspected" malingering. He added that because the minor understood the nature of the proceedings and had the ability to cooperate with counsel, the minor was not *in*competent. He testified he could not be "100 percent" certain, but he was confident in his opinion that the minor was malingering. The minor cites no authority for the implied proposition that absolute certainty is required in such matters.

The minor misinterprets a passage of Dr. Dugan's testimony, contending he testified his 2012 report (indicating malingering and competency)--rather than a 2011 test result which was a component of his 2011 report (indicating incompetency)--was invalid. However, it is clear that Dugan was referring to the 2011 test result indicating incompetency when he answered: "I'm saying it possesses questionable enough validity that I no longer consider that assessment to be a realistic and credible assessment of this minor's cognitive ability." He went on to explain that the 2011 test was invalid *because* the minor was a malingerer and therefore the data the minor presented and any conclusions derived therefrom were "suspect." Thus, *in context*, Dr. Dugan's testimony

10

did not undermine his 2012 report concluding the minor was malingering and not incompetent, but supported it.[5]

The minor also misinterprets a passage of White's testimony, asserting the witness directly testified the minor's ability to comprehend "was still unknown." The cited testimony was that White had not yet evaluated the minor's ability in that regard, as he had a certain training regimen and had not yet progressed to the comprehension part of the competency training. On redirect, White testified the minor was answering questions quickly, without thinking about them. He also testified the minor was, in fact, capable of learning, plotted to "regress" after learning what the word meant, and had intentionally regressed while in custody *after* he had spoken to another minor about competency issues. Thus, viewed favorably to the juvenile court's finding, White's testimony supported Dr. Dugan's view that the minor was malingering.

In sum, viewed in the light favorable to the juvenile court's finding, ample evidence shows the minor was competent to undergo an adjudication hearing, and was malingering to thwart the juvenile proceedings.

II

*DJF Commitment*

For several reasons, the minor contends his DJF commitment was improper. We address his claims separately, and reject each of them.

---

[5] It appears that questionably placed punctuation in the reporter's transcript may be responsible for the misunderstanding. The question asked by the prosecutor that elicited Dugan's response as detailed above reads in relevant part: "[Y]ou're saying that the [2011 test results] were based on your reevaluation -- your August 2012 evaluation was invalid; is that [correct]?" It should more properly read: "[Y]ou're saying that the [2011 test results] were -- based on your reevaluation, your August 2012 evaluation -- was invalid; is that [correct]?" Clearly the "was invalid" (although it should be "were invalid") refers back to the 2011 test results, not the reevaluation from 2012.

11

A. *Whether the Louisiana Petition Can Contain the Most Recent Offense*

Section 733, stated in the negative, provides in part that a ward shall not be committed to DJF if, inter alia, he or she "(c) . . . is adjudged a ward of the court pursuant to Section 602, and the most recent offense alleged in any petition and admitted or found to be true by the court is not described in subdivision (b) of Section 707." His most recent offense *alleged in a CA petition* was robbery; there is no dispute that this was a qualifying (section 707, subdivision (b)) offense.

The parties also agree the minor was the subject of a more recent Louisiana petition alleging acts that would *not* fall within section 707, subdivision (b) if committed in California. The minor contends the most recent Louisiana charge is "the most recent offense alleged in any petition" within the meaning of section 733, and therefore he may not be committed to DJF. We are not persuaded.

The key language of section 733, subdivision (c) is "the most recent offense alleged in *any petition* and admitted or found to be true by *the court*." (Italics added.) The parties dispute the meaning of "any petition" and "the court" as those terms are used in this section.

"[A]ny" is broad and generally "means *all* or *every*." (*California Grocers Assn. v. Department of Alcoholic Beverage Control* (2013) 219 Cal.App.4th 1065, 1078 (conc. opn. of Duarte, J.).) The section's use of "any" lends some support to the minor's claim that "any petition" means "any delinquency petition," that is, any petition wherever filed.

A "petition" under section 733 means a section 602 petition, not a VOP notice. (*In re D.B.* (2014) 58 Cal.4th 941, 944; *In re Greg F.*, *supra*, 55 Cal.4th at pp. 404-405; *In re J.L., supra,* 168 Cal.App.4th at pp. 58-60.) However, as we will explain, section 602 refers to petitions alleging state or federal crimes committed in California; there is no basis for California to exercise jurisdiction over crimes committed in sister-states. When we consider the delinquency scheme as a whole, as we must, we conclude the minor's proffered candidate of meaning is not a *plausible* meaning, so as to raise a true

12

ambiguity. (See *Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1179-1180.)

"[T]he goal of statutory construction is ascertainment of legislative intent so that the purpose of the law may be effectuated, and that we should construe a statute in the context of the entire statutory system of which it is a part, in order to achieve harmony among the parts." (*People v. Shirokow* (1980) 26 Cal.3d 301, 306-307; see *In re M.M.* (2012) 54 Cal.4th 530, 536.) Therefore, we review other sections of the delinquency law that may bear on the meaning of the words "petition" and "court" as used in section 733.

Section 245 provides in part: "Each superior court shall exercise the jurisdiction conferred by this chapter, and while sitting in the exercise of such jurisdiction, shall be known and referred to as the juvenile court." The "court" referred to is a *California* court. (See Cal. Const., art. VI, § 4.) Section 650 provides in part: "Juvenile court proceedings to declare a minor a ward of the court *pursuant to Section 602* are commenced by the filing of a petition by the prosecuting attorney." (§ 650, subd. (c), italics added.) The reference to section 602 negates the idea that a proceeding based on Louisiana law would be deemed "commenced by the filing of a petition" under this statute. (See also Cal. Rules of Court, rule 5.502(29) [" 'petitioner,' in section 601 and 602 proceedings, means the probation officer or prosecuting attorney"].)

In turn, section 602 provides in part: "Except as provided in subdivision (b) [listing particularly serious crimes], any person who is under 18 years of age when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age, is within the jurisdiction *of the juvenile court*, which may adjudge such person to be *a ward of the court*." (§ 602, subd. (a), italics added.) Plainly, the court referenced is the juvenile court, which is a department of each *California* county's superior court. (See § 245.)

13

Section 656 specifies the contents of a wardship petition commencing delinquency proceedings in a California juvenile court. Section 656.1 requires that "Any petition alleging that the minor *is a person described by Section 602* shall specify as to each count whether the crime charged is a felony or a misdemeanor." (Italics added.) Again, the referenced statutes refer to California proceedings under section 602, not *any* proceeding.

As stated by our Supreme Court, albeit in another context: "No section 602 case begins until the prosecutor files a petition under that statute *on the People's behalf.*" (*In re Eddie M.* (2003) 31 Cal.4th 480, 487, italics added.) "In a juvenile court hearing which is based upon a petition that alleges that the minor upon whose behalf the petition is being brought is a person within the description of Section 602, the prosecuting attorney shall appear *on behalf of the people of the State of California.*" (§ 681, subd. (a), italics added.) These passages again plainly reference the *California* cases.

Ultimately, after an admission or contested hearing, "If the court has found that the minor is a person described by Section 601 or 602, it may order and adjudge the minor to be a ward of the court." (§ 725, subd. (b).) This usage of "the court," too, plainly references a *California* juvenile court. "California juvenile court law . . . does not apply to any person who violates a law of another state defined as a crime and is at the time of the violation under 18 years of age, or who subsequently flees into the State of California." (Seiser & Kumli, Cal. Juvenile Courts Practice And Procedure (2015), Jurisdiction, § 3.20[6], p. 3-37.)

Accordingly, we do not believe the minor's candidate of meaning of section 733, subdivision (c) plausibly accounts for the statutory language, when the statutory scheme is viewed as a whole, rather than in isolation. But even assuming without finding that there is any ambiguity to resolve, we would apply the venerable rule that statutes do not apply extraterritorially absent an explicit Legislative indication. "However far the Legislature's power may theoretically extend, we presume the Legislature did not intend a statute to be ' " operative, with respect to occurrences outside the state . . . unless such

14

intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its purpose, subject matter or history.' " ' " (*Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1207.)

The minor emphasizes the *purposes* of section 733 were to reduce the number of delinquents housed in state facilities to end litigation, save money, and achieve better results for youthful offenders, by limiting DJF commitments to the more serious delinquents. (See *In re Greg F.*, *supra*, 55 Cal.4th at p. 409-410; *In re N.D.* (2008) 167 Cal.App.4th 885, 891-892.) But while acting to achieve those purposes, the Legislature, presumably aware of the statutes just described, and the presumption against extraterritoriality of state statutes (see *Estate of McDill* (1975) 14 Cal.3d 831, 837-839; *In re Eddie L.* (2009) 175 Cal.App.4th 809, 815), could have written section 733 so as to encompass foreign delinquency petitions. It did not do so.

Accordingly, we reject the minor's claim that the Louisiana petitions have any relevance to his eligibility for a DJF commitment under section 733.

B. *Advisement as to Consequences*

The minor contends his admission to the VOP was invalid because he was not told he might be committed to DJF, did not understand the consequences of his admission, and therefore his commitment is invalid. We disagree.

Recently, in *People v. Cross* (2015) 61 Cal.4th 164, a case involving a defendant's stipulation that he had a prior conviction, our Supreme Court reemphasized that the direct penal consequences of a plea or admission must be explained to a criminal defendant, as a rule of judicially-created procedure. Similarly, a minor must be told the maximum possible confinement time he or she faces before a juvenile court accepts an admission to a section 602 petition or section 777 VOP notice. (See, e.g., *In re Gary O.* (1978) 84 Cal.App.3d 38, 40-42 [where minor was misadvised about his maximum commitment, and promptly moved to withdraw his admission, the motion should have been granted].)

15

Here, the minor was advised that he would be placed on probation again if he admitted the present VOP, but if he violated probation again his maximum potential confinement was five years. Further, his counsel represented that he had discussed with the minor the consequences of his admission to the VOP.

The minor then asked the court what a "violation" meant, and the juvenile court repeated: "You will continue to be on probation and you'll have terms and conditions that guide your behavior while you're on probation. [¶] If you violate any of those terms and conditions, what I'm telling you is you face a maximum confinement time of five years. [¶] It doesn't necessarily mean that that's what would be imposed for a violation, but we always want to make sure you know that maximum confinement time, the worst case scenario." The minor said he understood, apparently again conferred with his attorney, and then--after being fully advised of and explicitly waiving (both personally and through counsel) his rights to a bench trial, to confront witnesses, to subpoena witnesses on his behalf, and the privilege against self-incrimination--the minor admitted the VOP. After the parties stipulated to a factual basis, the trial court (Oros, J.) found the "admission and waivers were made knowingly, intelligently, and voluntarily" and accepted the admission.

The court did not, however, advise the minor that the five-year "worst case scenario" could be served *at DJF*, which is the recommended advisement when accepting a juvenile's admission. (See Cal. Judges Benchguides, Benchguide 118, Juvenile Delinquency Jurisdiction Hearing (CJER 2011 rev.) § 118.62, p. 118-39.) But the minor never objected on the ground of misadvisement as to the VOP, although counsel at disposition urged that the minor had not understood his section 602 admission.

On appeal, the minor contends he should have been advised on the record about the possibility that he could be committed to DJF and reversal is required. We disagree.

First, as the Attorney General points out, the lack of objection forfeits the claim. (See *In re Ian J.* (1994) 22 Cal.App.4th 833, 839-840 [advisement as to maximum

16

penalty not constitutionally required; objection necessary]; cf. *People v. Walker* (1992) 54 Cal.3d 1013, 1022-1023 [similar rule in criminal cases], overruled on a different point by *People v. Villalobos* (2012) Cal.4th 177, 183.)  Neither at the hearing on the VOP admission nor at the dispositional hearing did the minor claim he had been under-advised.

Second, the minor's counsel cites no authority for the proposition that *where* a minor might be confined is a consequence of an admission that must be explained on the record lest automatic reversal ensue.  Instead, prejudice must be shown.  (See *In re Jimmy M*. (1979) 93 Cal.App.3d 369, 372-374 [minor should have been told of possible Youth Authority commitment, but no prejudice shown on direct appeal because the record did not show the lack of advisement made a difference, i.e., that the minor would not have made the admission anyway]; accord, *In re Ronald E*. (1977) 19 Cal.3d 315, 325-326 [on habeas corpus, question was: "Is it reasonably probable that petitioner might not have been committed to the Youth Authority had the court advised him, prior to his admission of the truth of the allegations, that he might be so committed?"; answer: no such showing was made].)  This record shows the minor knew he could be confined for up to five years, had discussed the consequences of his admission with his counsel, and entered a knowing and voluntary admission.  (See Cal. Judges Benchguide, *supra*, § 118.45, p. 118:28.) There is no showing he would not have admitted the VOP had he been advised otherwise, despite counsel's speculations, outlined for the first time in the reply brief.[6]

Accordingly, we reject the claim of reversible error as to the VOP admission.

---

[6] The minor also appears to suggest he was misadvised because the juvenile court told him on November 15 that he would receive probation, and only potentially suffer a five-year commitment if he again violated probation.  But the minor *did* violate probation after this admission, resulting in the November 29 VOP, which was later dismissed with the understanding it could be used at disposition.

C. *Abuse of Discretion*

The minor contends the juvenile court abused its discretion in making the DJF placement. He argues his only serious crime occurred five years before, his criminality was de-escalating, viable alternatives to DJF existed, and reiterates the point that section 733 militates in favor of local incarceration of juveniles.

"A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion. [Citation.] ' "We must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." ' " (*In re Robert H*. (2002) 96 Cal.App.4th 1317, 1329-1330.)

Delinquent minors "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of" the juvenile court laws. (§ 202, subd. (b).) "In reaching a disposition, the court considers (1) the minor's age, (2) the circumstances and gravity of the offense, and (3) the minor's previous delinquent history. (§ 725.5.)" (*In re Greg F*., *supra*, 55 Cal.4th at p. 404.) There must be evidence demonstrating a probable benefit to the minor by a DJF commitment and the inappropriateness or ineffectiveness of lesser alternatives, though a court need not actually place a minor through lesser alternatives if it determines a DJF commitment is appropriate in the first instance. (See *In re Eddie M*., *supra*, 31 Cal.4th at p. 507; *In re Angela M*. (2003) 111 Cal.App.4th 1392, 1396; *In re Asean* (1993) 14 Cal.App.4th 467, 473.) The juvenile court must find that the ward will be benefited by the reformatory educational discipline or other treatment provided by DJF. (§ 734; see *In re Edward C*. (2014) 223 Cal.App.4th 813, 829.)

In this case the probation department recommended continued wardship, 45 days of further detention, and release of the minor to his mother under probation supervision,

commencing with a period of electronic monitoring. Later, the probation department reported that all Level B facilities had rejected the minor, "based on his level of functioning, violent/aggressive behaviors, gang involvement, and extreme non-compliance." The prosecution then filed a brief supporting a DJF commitment and the minor opposed.

The juvenile court read and considered the various reports and briefs, and heard arguments for and against a DJF commitment. The juvenile court asked whether a "YDF" commitment (youth detention facility or juvenile hall) was feasible, and the People replied that there were no programs that would benefit the minor there, the minor had already been in custody for nearly 300 days, and that such a disposition would not adequately protect the public or help reform the minor. The minor's counsel thought a local commitment was appropriate, although he acknowledged that would not provide the same level of programming available at DJF.

The juvenile court then asked the probation officer about recent incidents in custody, and learned there already had been five incident reports during the first three months of 2013. After a break to review further material, the court summarized the case, noting that in 2008 the minor had been made a ward for robbery; while placed in Louisiana he had committed multiple burglaries, one with his father; he was on electronic monitoring when he committed several of the VOP offenses; and he engaged in assaultive conduct while in the hall. During this time, "not only has he failed to reform, but his delinquent behavior has escalated." Probation had not worked, and the parents were unable to provide necessary services, whereas the minor would benefit from the "reformatory and educational discipline and other treatments provided by [DJF], and less restrictive alternatives are both ineffective and inappropriate." The court observed that it was apparent based upon rejections received from all of the Level B facilities that Level A and B placement were not adequate to serve the minor's needs. YDF was not designed

for long-term placement, and was inappropriate, partly because of the lack of available programs that would benefit the minor.

To summarize the minor's criminal record as considered by the juvenile court: In 2008, at age 12, in addition to admitting a second degree robbery, the minor agreed that a dismissed residential burglary charge could be used for dispositional purposes.[7] The minor then committed three other burglaries, a "simple burglary" in Louisiana and two more residential burglaries in California. He threatened his mother with a sawed-off shotgun in January 2012 and then absconded. Later in 2012 he threatened a school official, and still later that year possessed a loaded firearm at school. *After* the minor admitted violating probation by committing a burglary, and agreed all remaining charges could be used for dispositional purposes, he assaulted another resident of his detention facility.

Given the minor's continued level of violence and recalcitrance, a DJF commitment in this case fell well within the juvenile court's discretion.[8]

The minor makes a public policy argument, as follows: The minor committed his last serious offense (i.e., one listed in section 707, subdivision (b)) five years before the dispositional hearing, while aged 12; therefore because the general purpose of section 733, subdivision (c) is to limit state custody of juveniles to violent offenders, it was an abuse of discretion to commit this minor to DJF.

We reject a necessary predicate of this claim. Although the minor claims he never committed "another 707(b) offense," he overlooks the fact that he agreed dismissed VOP

---

[7] Both the Attorney General and minor's appellate counsel erroneously refer to one of the dismissed charges as a grand theft rather than a residential burglary.

[8] Although the 90-day diagnostic report was never obtained, the juvenile court was aware of the referral and subsequent non-delivery, and impliedly concluded it nonetheless had sufficient information to make an informed disposition. We do not take issue with that conclusion.

charges could be considered at disposition. One of those charges--threatening his mother with a sawed-off shotgun--included an allegation that he personally used a firearm during the offense within the meaning of Penal Code section 12022.5, subdivision (a). Section 707, subdivision (b) lists, among many other crimes, "An offense described in Section 12022.5 or 12022.53 of the Penal Code." (§ 707, subd. (b)(17).) Therefore it is not persuasive to argue a DJF commitment here transgresses the general policy underlying section 733, when the minor in fact *did* commit a further DJF-eligible offense by pointing a sawed-off shotgun at his own mother. Nor was this the minor's only violent act after the original robbery.

The minor's arguments about possible lesser placements again amount to an invitation to this court to reweigh the facts before the juvenile court, and disregard now-settled principles, set forth as follows: "Under section 202, juvenile proceedings are primarily 'rehabilitative' [citation], and punishment in the form of 'retribution' is disallowed [citation]. Within these bounds, the court has broad discretion to choose probation and/or various forms of custodial confinement in order to hold juveniles accountable for their behavior, and to protect the public. [Citation.] The voters reaffirmed these basic principles when they approved Proposition 21 . . . . Given these aims, and absent any contrary provision, juvenile placements need not follow any particular order under section 602 and section 777, including from the least to the most restrictive. [Citations.] Nor does the court necessarily abuse its discretion by ordering the most restrictive placement before other options have been tried." (*In re Eddie M.*, *supra*, 31 Cal.4th at p. 507.)

Given the need to protect the public from further violent predation by the minor, who has shown no signs of reformation, and the juvenile court's finding that local placements did not have the programming to benefit the minor, the record amply supports the juvenile court's dispositional order in this case. No abuse of discretion is shown.

## DISPOSITION

The dispositional order is affirmed.


      DUARTE      , J.


We concur:


      ROBIE      , Acting P. J.


      MAURO      , J.